NUGGET HYDROELECTRIC, L.P., Plaintiff–Appellant,

v.

PACIFIC GAS AND ELECTRIC COMPANY, Defendant–Appellee.

Nos. 91–15785, 91–16306.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 17, 1992.

Decided Dec. 7, 1992.

Steven N. Yermish and Richard L. Caplan, Caplan & Luber, Paoli, PA, for plaintiff-appellant.

Terry J. Houlihan, Raymond C. Marshall, Patrick C. Cooper and Christopher Van Gundy, McCutchen, Doyle, Brown & Enersen, and Douglas A. Oglesby and Randall J. Litteneker, Pacific Gas and Elec. Co., San Francisco, CA, for defendant-appellee.

Before: WALLACE, Chief Judge, GOODWIN and POOLE, Circuit Judges.

WALLACE, Chief Judge:

Nugget Hydroelectric, L.P. (Nugget) appeals from the district court's judgment in favor of Pacific Gas & Electric Company (PG & E) based upon dismissal of its claim under section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and the district court's denial of leave to amend its claims under

the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68. Nugget also challenges the district court's order denying Nugget leave to amend its state law claims and dismissing them. Nugget further contends that the district court improperly refused to reconsider the magistrate judge's denial of a discovery request and imposition of sanctions under Federal Rule of Civil Procedure 11. The district court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We affirm in part, and vacate in part and remand.

## I

PG & E is a California public utility that buys, sells, and distributes electricity under the regulation of the California Public Utility Commission (Commission). In 1984, PG & E entered into three power purchase agreements with Nugget's predecessor-in-interest, Enviro Hydro (Hydro), which planned to be a private power supplier. PG & E agreed to purchase energy at a certain price over a 30 year period from three Hydro projects, which were to be built in eastern California on federal land. The power purchase agreements provided that they would terminate if the projects failed to commence delivery of energy by November 5, 1989, five years after their execution. The agreements also provided that the delivery deadline could be extended in the event of a *force majeure* occurrence.

Nugget acquired Hydro's interest in the power purchase agreements in 1988, about one year before the deadline. At that time, Hydro had neither begun construction of any of the three projects nor secured the necessary permits from various government agencies. Nugget first sought from PG & E a *force majeure* extension of the power delivery deadline, pointing to permitting delays. *Force majeure* "refers to uncontrollable or unforeseeable circumstances or actions which would relieve one party in a contract from certain obligations." Commission Guidelines Re Power Purchase Contracts Between Electric Utilities and Qualifying Facilities (Guidelines), 29 C.P.U.C.2d 415, 431 (1988). PG & E initially denied Nugget's *force majeure* claim, but later offered a deferral if Nugget would agree to certain price concessions and waive all potential *force majeure* claims. Nugget rejected PG & E's offer, and tried to meet the deadline. Nugget and PG & E discussed various interconnection plans: the means by which the energy produced by Nugget's power projects would be delivered to PG & E. In August, PG & E represented to Nugget that one of these plans was preferable and that it would cost Nugget an estimated $260,000–$270,000. In October, PG & E notified Nugget that it had approved in principle the interconnection plan and was prepared to produce a final estimate of cost. Nugget authorized PG & E to proceed.

In February 1989, PG & E sent Nugget its final analysis of the interconnection plan, which deviated substantially from PG & E's earlier representations. Among other things, it estimated that the plan would cost Nugget $825,520 and would not be ready to begin delivering power until six weeks after the deadline. In addition, PG & E advised Nugget that it might be required to reimburse PG & E for unknown "take or pay" energy costs pursuant to a contract between the Placer County Water Authority and PG & E, but PG & E refused to disclose to Nugget the contract's provisions. PG & E also advised Nugget that operation of the plan was contingent upon the consent of a third party landowner, who, according to PG & E, refused to agree. However, two days later Nugget approached the landowner and secured the requisite consent with ease.

These events proved disquieting to Nugget's lender, Credit Suisse, and in April 1989, it declared a default of the loan agreements and withdrew its financial support of Nugget's projects. Seven months later, Nugget filed for bankruptcy protection.

## II

■ The district court dismissed Nugget's antitrust claim under Federal Rule of

Civil Procedure 12(b)(6) because it determined that PG & E was immune from antitrust liability under the state action doctrine. *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) (*Parker*). We review Nugget's dismissal de novo. *See Grason Elec. Co. v. Sacramento Mun. Util. Dist.,* 770 F.2d 833, 835 (9th Cir.1985), *cert. denied,* 474 U.S. 1103, 106 S.Ct. 886, 88 L.Ed.2d 921 (1986).

### A.

■ Nugget first argues that the state action doctrine has been preempted as to utilities by the Public Utility Regulatory Policies Act of 1978 (Act), Pub.L. No. 95–617, 92 Stat. 3117 (codified as amended in scattered sections of 15, 16, 30, 42, and 43 U.S.C.). The specific section of the Act on which Nugget relies provides that "[n]othing in this Act or in any amendment made by this Act affects ... the applicability of the antitrust laws to any electric utility or gas utility (as defined in section 3202 of Title 15)." 16 U.S.C. § 2603(1). Nugget contends that the phrase "antitrust laws" refers only to statutory law and does not encompass the common law state action doctrine.

■ The Act's definition of "antitrust laws" "includes the Sherman Antitrust Act, the Clayton Act, the Federal Trade Commission Act, the Wilson Tariff Act, and the Act of June 19, 1936, chapter 592." 16 U.S.C. § 2602(1) (citations omitted). The definition's use of the word "includes" suggests that the phrase "antitrust laws" may encompass more than just these statutes. *See Highway & City Freight Drivers v. Gordon Transps., Inc.,* 576 F.2d 1285, 1289 (8th Cir.), *cert. denied,* 439 U.S. 1002, 99 S.Ct. 612, 58 L.Ed.2d 678 (1978); *American Fed'n of Television & Radio Artists v. NLRB,* 462 F.2d 887, 889–90 (D.C.Cir.1972); *United States v. Gertz,* 249 F.2d 662, 666 (9th Cir.1957). In interpreting another statute, the Supreme Court has held that the term "laws" encompasses both statutes and court decisions. *See Illinois v. City of Milwaukee,* 406 U.S. 91, 99–100, 92 S.Ct. 1385, 1390–91, 31 L.Ed.2d 712 (1972). We conclude that the phrase "antitrust laws"

embraces not only the text of the Sherman Antitrust Act and the other listed statutes, but also the courts' interpretations of them. The state action doctrine is an interpretation of the Sherman Antitrust Act, *see Parker,* 317 U.S. at 350–51, 63 S.Ct. at 313–14, of which Congress was aware, *see Director, Office of Workers' Compensation Programs v. Perini North River Assocs.,* 459 U.S. 297, 319–20, 103 S.Ct. 634, 648–49, 74 L.Ed.2d 465 (1983), when it chose the phrase "antitrust laws." The plain meaning of section 2603(1) thus establishes that the Act is to have no effect on the applicability of the state action doctrine to gas and electric utilities like PG & E.

Nugget argues that the legislative history reveals that Congress clearly intended that, with respect to gas and electric utilities, the Act would preempt the state action doctrine. However, because the meaning of section 2603(1) is clear and fails to compel an absurd result, we are discouraged from examining its legislative history. *See United Air Lines v. McMann,* 434 U.S. 192, 199, 98 S.Ct. 444, 448, 54 L.Ed.2d 402 (1977) ("legislative history ... is irrelevant to an unambiguous statute"); *Public Citizen v. United States Dep't of Justice,* 491 U.S. 440, 473, 109 S.Ct. 2558, 2576, 105 L.Ed.2d 377 (1989) (Kennedy, J., concurring) ("Where it is clear that the unambiguous language of a statute embraces certain conduct, and it would not be patently absurd to apply the statute to such conduct, it does not foster a democratic exegesis for this Court to rummage through unauthoritative materials to consult the spirit of the legislation in order to discover an alternative interpretation of the statute with which the Court is more comfortable."); *Green v. Bock Laundry Mach. Co.,* 490 U.S. 504, 508–09, 109 S.Ct. 1981, 1983–84, 104 L.Ed.2d 557 (1989); *In re Kelly,* 841 F.2d 908, 912 (9th Cir.1988). We will look no further than the face of the statute.

### B.

■ Nugget argues in the alternative that even if the state action doctrine were available to gas and electric utilities, the doctrine does not protect PG & E's conduct

because it fails to satisfy the doctrine's requirements as described in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (*Midcal*). Private party conduct is immune from antitrust liability only if the party claiming immunity shows that its conduct satisfies two requirements. First, it must be "clearly articulated and affirmatively expressed as state policy." *Id.* at 105, 100 S.Ct. at 943 (internal quotation marks omitted). This may be satisfied if the conduct is a "foreseeable result" of the state's policy. *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 38–39, 42, 105 S.Ct. 1713, 1716–17, 1718, 85 L.Ed.2d 24 (1985). Second, the conduct must be "actively supervised by the State itself." *Midcal,* 445 U.S. at 105, 100 S.Ct. at 943 (internal quotation marks omitted). This is satisfied only if "state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy." *Patrick v. Burget,* 486 U.S. 94, 101, 108 S.Ct. 1658, 1663, 100 L.Ed.2d 83 (1988) (*Patrick*); *see Federal Trade Comm'n v. Ticor Title Ins. Co.,* — U.S. —, —, 112 S.Ct. 2169, 2179, 119 L.Ed.2d 410 (1992) (*Ticor*).

Nugget alleges that PG & E engaged in several anticompetitive acts. Three involve PG & E's handling of Nugget's *force majeure* claim: PG & E (1) refused to grant Nugget's *force majeure* claim, (2) conditioned deferral of the delivery deadline on unreasonable price concessions by Nugget, and (3) negotiated deferral in bad faith. Four other alleged acts appear to concern PG & E's handling of Nugget's interconnection plan: PG & E (1) lied to Nugget when explaining why PG & E could not honor its obligations under the power purchase agreements, (2) withheld from Nugget information that its interconnection plan would not work, (3) demanded reimbursement for inflated costs for the plan's special facilities, and (4) imposed unreasonable, dilatory, or economically prohibitive conditions on the plan. Nugget argues that PG & E has failed to show that any of these acts satisfies either requirement of clear articulation or active supervision.

1.

■ We first address the acts Nugget alleges PG & E committed with respect to Nugget's *force majeure* claim. PG & E contends that this conduct is plainly authorized by a state statute, Cal.Pub.Util.Code § 2821(b), and state implementing regulations, i.e., the Guidelines. Section 2821(b) authorizes the Commission to "specify the prices, terms, and conditions" for the sale of power by a private power producer like Nugget to a utility. The Guidelines provide that private power producers generally bear the risk of failing to develop their power facility before the five year deadline, and that only rarely will permitting delays qualify as *force majeure* events. 29 C.P.U.C.2d at 431, 432. The Commission "expect[s] the utility to carefully scrutinize each claim of force majeure, consistent with these guidelines, and negotiate only in instances where it is convinced that a settlement, versus adjudication, is in the ratepayers' best interest." *Id.* at 432. The Guidelines demonstrate that PG & E's refusal either to grant Nugget's *force majeure* claim or to defer the start-up deadline without Nugget's agreeing to certain concessions was a foreseeable result of state policy, and therefore satisfies the clear articulation requirement of the state action doctrine.

Nugget's contention that PG & E performed these acts in bad faith, and therefore in contravention of state policy, is to no avail. In *Llewellyn v. Crothers,* 765 F.2d 769 (9th Cir.1985), we rejected a claim that the bad faith behind the anticompetitive conduct of certain government officials destroyed their immunity under the state action doctrine, stating that it

does not depend on the subjective motivations of the individual actors, but rather on the satisfaction of the objective standards set forth in *Parker [v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943),] and authorities which interpret it. This must be so if the state action exemption is to remain faithful to its foundations in federalism and state sovereignty. A contrary conclusion would

compel the federal courts to intrude upon internal state affairs whenever a plaintiff could present colorable allegations of bad faith on the part of defendants. *Id.* at 774. This reasoning applies equally to all defendants, private as well as public. Therefore, Nugget's allegations of bad faith have no effect on the conclusion that PG & E's actions with respect to Nugget's *force majeure* claims satisfy the clear articulation requirement of the state action doctrine.

### 2.

■ Nugget also argues that PG & E's handling of its *force majeure* claims fails to satisfy the second requirement of the state action doctrine: active supervision. PG & E argues that under the Guidelines its conduct is actively supervised by the state. They provide that a qualified power producer who believes that the utility has failed to bargain over contract modifications with it in good faith may file a formal complaint with the Commission. 29 C.P.U.C.2d at 428. This provision shows that state officials have the power to review PG & E's actions with respect to *force majeure* claims, but fails to satisfy the requirement that they in fact exercise their power. *See Ticor,* —— U.S. at ——, 112 S.Ct. at 2179; *Patrick,* 486 U.S. at 101, 108 S.Ct. at 1663. To demonstrate this, PG & E cites a series of published Commission decisions that have reviewed *force majeure* claims and settlement agreements involving PG & E and private power producers. *See, e.g., Sayles Hydro Assocs. v. Pacific Gas & Elec. Co.,* C.P.U.C. Decision No. 90–12–074, 1990 Cal. PUC LEXIS 1393 (Dec. 19, 1990); *Pacific Gas & Elec.,* 36 C.P.U.C.2d 463 (1990); *Pacific Gas & Elec.,* 36 C.P.U.C.2d 342 (1990); *Pacific Gas & Elec.,* 30 C.P.U.C.2d 56 (1988). The existence of these decisions is a fact "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). Nugget had an opportunity at oral argument to argue against our consideration of them. *See id.* at 201(e). We may therefore take judicial notice of these decisions. *See id.* at 201; *Sinaloa Lake Own-*

*ers Ass'n v. City of Simi Valley,* 882 F.2d 1398, 1403 & n. 2 (9th Cir.1989), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990); *United States v. Camp,* 723 F.2d 741, 744 n. ** (9th Cir. 1984). These decisions and the Guidelines are sufficient to prove that the state actively supervises PG & E's handling of *force majeure* claims. This supervision along with PG & E's showing that its actions with respect to Nugget's *force majeure* claims are a foreseeable result of state policy demonstrates that PG & E is immune from antitrust liability for its actions concerning Nugget's *force majeure* claims.

### 3.

■ We turn now to PG & E's actions surrounding Nugget's interconnection plan. Nugget contends that PG & E has failed to show that this conduct satisfies either requirement of clear articulation or active supervision. We need go no farther than to hold that PG & E did not demonstrate the clear articulation requirement. PG & E failed to offer any state statute, regulation, or other authority suggesting that PG & E's conduct relating to the interconnection plan was a foreseeable result of state policy. Instead, PG & E contends that Nugget did not allege that these actions either injured Nugget or had an effect on competition. Although these omissions may be relevant to determining whether Nugget has stated an antitrust claim, they are irrelevant to determining whether PG & E has shown that the acts Nugget alleges PG & E committed are entitled to immunity. Because PG & E has failed to show that its actions concerning Nugget's interconnection plan are the foreseeable result of state policy, they are not immune under the state action doctrine.

### C.

■ Our determination that PG & E's alleged actions concerning Nugget's interconnection plan are not immune does not automatically require us to reverse the district court's dismissal of Nugget's antitrust claim. We may affirm the district court on any ground supported by the record. *Mar-*

**436**

*ino v. Vasquez,* 812 F.2d 499, 508 (9th Cir.1987). PG & E argues that we should affirm the dismissal of Nugget's antitrust claim based upon the interconnection because it has failed to state a monopolization or attempted monopolization claim under 15 U.S.C. § 2.

■■■■ In order to state a valid monopolization claim, Nugget must allege: (1) possession of monopoly power in a relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury. *Catlin v. Washington Energy Co.,* 791 F.2d 1343, 1347 (9th Cir.1986) *(Catlin ).* PG & E argues that Nugget has failed to allege the second element. Nugget contends that it could have generated and sold power in interstate commerce in competition with PG & E, and that by causing Nugget's demise PG & E enhanced its monopoly power. Perhaps so, but Nugget's complaint alleges instead that Nugget planned to be a supplier to PG & E. Therefore, Nugget's failure could not have helped PG & E acquire or maintain monopoly power. In its reply brief, Nugget alternatively contends that its bankruptcy allowed PG & E to enhance its monopoly power because this would enable it to build its own additional power supply, and increase its rate base and income. Because Nugget failed to raise this argument in its opening brief, it is waived. *See Thompson v. Commissioner,* 631 F.2d 642, 649 (9th Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981). We hold that Nugget has failed to state a cognizable monopolization claim against PG & E.

■■■■ In order to state an attempted monopolization claim, Nugget must allege: (1) specific intent to monopolize a relevant market; (2) predatory or anticompetitive conduct; and (3) a dangerous probability of success. *Catlin,* 791 F.2d at 1348. Nugget has failed to satisfy the third element of the attempted monopolization claim for the same reasons that Nugget failed to satisfy the willful acquisition or maintenance of power element for the monopolization claim. Therefore, we affirm the district court's dismissal of Nugget's antitrust claim with respect to PG & E's actions regarding Nugget's interconnection plan on the basis that Nugget failed to state an antitrust claim.

**III**

■■■■ Nugget argues that the district court erred by denying leave to amend its RICO claims. Nugget contended before the district court and argues to us that its proposed amended complaint adequately alleges that it was injured by PG & E's violations of sections 1962(a) and 1962(c). The district court disagreed. We review the denial of leave to amend for abuse of discretion. *Western Shoshone Nat'l Council v. Molini,* 951 F.2d 200, 204 (9th Cir.1991), *cert. denied,* — U.S. ——, 113 S.Ct. 74, 121 L.Ed.2d 39 (1992).

**A.**

■■■■ Turning first to Nugget's claim under section 1962(c), the issue before us is whether its proposed amended complaint alleges facts showing a nexus between PG & E's alleged racketeering acts and the conduct of the enterprise. Section 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." To state a claim under this section, Nugget must allege a nexus between the enterprise and the racketeering activity by showing that the racketeering activity "in some way stem[s] from the enterprise's activities or otherwise ha[s] some relationship to the enterprise." *Sun Sav. & Loan Ass'n v. Dierdorff,* 825 F.2d 187, 195 (9th Cir.1987).

Nugget's proposed amended complaint fails to do this. It alleges that the enterprise, consisting of certain California utilities including PG & E, intended to "maintain the dominance of its members in the generation and sale of electric power within California." Although we do not require a plaintiff to allege that the racketeering activity benefited the enterprise, we do require some kind of relationship, *see id.,* and Nugget's amended complaint fails to allege

that PG & E's racketeering acts had any relationship with these other utilities, to enhance their market dominance or otherwise. The argued nexus rests on the assumption that Nugget is a competitor of the enterprise members, but it is clear from the amended complaint that Nugget planned to be a supplier to PG & E. Because this defect would render Nugget's section 1962(c) claim subject to dismissal, the district court did not abuse its discretion by denying Nugget leave to amend this part of its complaint. *See Saul v. United States,* 928 F.2d 829, 843 (9th Cir. 1991).

### B.

■■■ We next consider whether, under section 1962(a), Nugget's proposed amended complaint must allege that Nugget was injured by PG & E's investment of its alleged racketeering income. The Ninth Circuit has not yet decided this question. *See Reddy v. Litton Indus.,* 912 F.2d 291, 295–96 (9th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 332, 116 L.Ed.2d 272 (1991). However, three of the four circuits to consider this question have determined that the plain language of sections 1964(c) and 1962(a) read together require that a RICO plaintiff make such a showing. *See Ouaknine v. MacFarlane,* 897 F.2d 75, 83 (2d Cir.1990) (*Ouaknine*); *Rose v. Bartle,* 871 F.2d 331, 356–58 (3d Cir.1989) (*Rose*); *Grider v. Texas Oil & Gas Corp.,* 868 F.2d 1147, 1149–51 (10th Cir.) (*Grider*), *cert. denied,* 493 U.S. 820, 110 S.Ct. 76, 107 L.Ed.2d 43 (1989); *but see Busby v. Crown Supply, Inc.,* 896 F.2d 833, 837–38 (4th Cir.1990).

In determining the elements of a RICO claim, we first examine the language of the statute. *See Russello v. United States,* 464 U.S. 16, 20, 104 S.Ct. 296, 299, 78 L.Ed.2d 17 (1983). Section 1964(c) provides a civil damage remedy only to those persons who are injured "by reason of a violation of section 1962." Section 1962(a) provides that "[i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest ... any part of such income ... in ... operation of ... any enterprise." The plain language of these two provisions leads us to conclude that a plaintiff seeking civil damages for a violation of section 1962(a) must allege facts tending to show that he or she was injured by the use or investment of racketeering income. Thus, we agree with the Second, Third, and Tenth Circuits. *See Ouaknine,* 897 F.2d at 82–83; *Rose,* 871 F.2d at 358; *Grider,* 868 F.2d at 1149.

Nugget urges us to follow the Fourth Circuit's decision in *Busby,* which held that a RICO plaintiff bringing an action for a violation of section 1962(a) need only allege facts showing an injury from the racketeering acts that generated income that was subsequently used in violation of the section. *See* 896 F.2d at 837–38. *Busby* reasoned that this reading of RICO is compelled in part by the expansiveness of the phrase "by reason of" in section 1964(a), which allows recovery, "despite the fact that one element of the violation, the use of the proceeds, may not have contributed to or caused the injury." *Id.* at 838. We conclude that section 1964(c) does not support such a reading, for it would allow an individual to recover for injuries caused by an action that does not constitute a violation of section 1962(a) even though section 1964(c) speaks not of an "element of a violation" but rather only of a "violation." To allow recovery for an injury arising from a mere element of a violation, rather than an actual violation, of section 1962(c), we would have to have before us a statute worded differently from the one Congress passed. Separation of powers principles and the value of democratic rule prohibit us from "interpreting" the statute such that we are, in fact, amending section 1964.

Nugget alternatively contends that it has complied with our adopted standard because it alleged the elements of a civil claim under section 1962(a) by alleging that PG & E received racketeering income and used it in a way that injured Nugget. Nugget made some allegations to this effect, but they are general, conclusory, and vague. Thus, Nugget's proposed amended complaint fails to state a claim under sec-

tion 1962(a). *See McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 810 (9th Cir. 1988); *North Star Int'l v. Arizona Corp. Comm'n*, 720 F.2d 578, 583 (9th Cir.1983); *Benson v. Arizona State Bd. of Dental Examiners*, 673 F.2d 272, 275–76 (9th Cir. 1982).

As with its section 1962(c) claim, Nugget's proposed amended complaint fails to state a claim under section 1962(a), and would be subject to dismissal; therefore, the district court did not abuse its discretion by denying Nugget leave to amend its complaint.

## IV

■ Nugget contends that the district court abused its discretion by dismissing its state law claims without allowing it leave to amend. Nugget asserted diversity jurisdiction. It was required to specify affirmatively the citizenship of all relevant parties, *see Kantor v. Wellesley Galleries, Ltd.*, 704 F.2d 1088, 1090 (9th Cir.1983), which in the case of a limited partnership such as Nugget, are the partners. *See Carden v. Arkoma Assocs.*, 494 U.S. 185, 195–96, 110 S.Ct. 1015, 1021–22, 108 L.Ed.2d 157 (1990). Nugget failed to comply with these requirements in its original complaint, although PG & E raised the issue. Nine months after this warning, Nugget finally attempted to take curative action in response to PG & E's motion for judgment on the pleadings. At that time, it submitted a proposed amended complaint that removed the defect.

The district court dismissed without prejudice these counts on the basis that it had dismissed the counts based upon federal question jurisdiction, and, therefore, these pendent counts should be dismissed. The court referred to the unsuccessful effort to plead diversity jurisdiction in the complaint, but did not consider the new jurisdictional allegations in the amended complaint, which properly allege diversity jurisdiction. It should have done so.

■ PG & E argues that we need not reverse because Nugget's efforts are too late. The district court may deny leave to amend for undue delay. *Foman v. Davis*,

371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Nugget explains that it delayed because "jurisdiction over Nugget's federal RICO claims was vested in the district court." We need not and should not reach this issue, as it was not first presented to the district court. We vacate that part of the judgment dismissing the state law claims and remand for the district court to consider the asserted diversity jurisdiction in Nugget's proposed amended complaint.

## V

■ Nugget argues that the district court abused its discretion by refusing to vacate the order of the magistrate judge denying Nugget's motion to compel production of documents and imposing sanctions under Federal Rule of Civil Procedure 11. Because we have affirmed the dismissal of all of Nugget's federal claims as a matter of law, we need not consider the district court's decision with respect to Nugget's motion to compel production of documents, except as they relate to the state law claims.

Nugget was required to prove fraudulent intent for its California law fraud claim. Nugget argues that its requested discovery was necessary to prove this claim. Nugget's allegations of fraud encompass only the misrepresentations it alleges PG & E made with regard to the cost and feasibility of the interconnection. Most of these alleged misrepresentations relate to Placer County Water Authority projects, whose existence was allegedly inimical to Nugget's interconnection plan.

Nugget's document request, however, demanded millions of pages of documents concerning every aspect of PG & E's relationships with private power suppliers, only a fraction of which could be deemed relevant to the subject matter of Nugget's fraud claim. The magistrate had adequate grounds to determine that most of the requested documents fall outside the scope of discovery articulated in Federal Rule of Civil Procedure 26(b)(1). The magistrate's conclusion that Nugget's request was un-

necessarily burdensome and overly broad is based upon Nugget's failure to make a "specific showing that the burdens of production would be minimal and that the requested documents would lead to relevant evidence." *Sorosky v. Burroughs Corp.*, 826 F.2d 794, 805 (9th Cir.1987). The district court did not abuse its discretion in refusing to grant Nugget's motion to reconsider the magistrate's order denying Nugget's motion to compel.

A separate issue is whether Rule 11 sanctions were properly granted. We review the district court's denial of a motion for reconsideration of a magistrate's imposition of sanctions for abuse of discretion. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 2460, 110 L.Ed.2d 359 (1990); *see Yusov v. Yusuf*, 892 F.2d 784, 788 (9th Cir.1989).

Rule 11 sanctions were imposed on Nugget for filing a second motion to compel. Sanctions must be imposed on a signer of a paper if the paper either is filed for an improper purpose or is frivolous. *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir.1990) (en banc). The standard governing this inquiry is an objective one, based on what was reasonable under the circumstances. *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 829 (9th Cir.1986).

The magistrate judge imposed sanctions because Nugget's second motion to compel largely duplicated its first motion to compel, which earlier had been denied and from which denial no motion for reconsideration was filed. The magistrate judge therefore decided that the pleading was filed for the improper purpose of harassing PG & E. Nugget's two motions to compel are sufficiently similar so that the district court did not abuse its discretion by refusing to vacate the order of the magistrate judge imposing Rule 11 sanctions on Nugget for filing the second motion to compel production of documents.

Nugget lastly contends that the amount of the sanctions awarded by the magistrate judge was excessive. We also review the amount of a sanctions award for abuse of discretion. *See id.* at 828.

The magistrate judge sanctioned Nugget in the form of attorneys' fees in the amount of $10,042. PG & E argues that because Nugget failed to file a notice of appeal from this decision, or exhaust its district court remedies pursuant to Local Rule 410–2(a), we may not consider Nugget's contention. *See Burt v. Hennessey*, 929 F.2d 457, 458 (9th Cir.1991). Nugget contends that it should be excused for such failure because it did not receive notice of the fee award from the court, and only learned of it from PG & E the day Nugget submitted its brief on appeal. Assuming, without deciding, that Nugget's excuse is satisfactory, based on our review of the record, we hold that the magistrate judge did not abuse his discretion by imposing the attorneys' fees as a sanction.

AFFIRMED IN PART; VACATED IN PART AND REMANDED.